IN RE WASHAKIE NEEDLES IRR. DIST.
PADLOCK RANCH, INC. v. WASHAKIE NEEDLES
IRR. DIST.

(No. 2032; February 23, 1938; 76 Pac. (2d) 617)

520

For the appellant, there was a brief and oral argument by *Arthur Ponsford* and *Joseph D. Pender* of Denver, Colorado, and *W. E. Mullen* of Cheyenne, Wyoming.

522

For the respondent, there was a brief by *C. W. Axtell* of Thermopolis and *E. J. Goppert* of Cody, and oral argument by *Mr. Goppert.*

523

RINER, Justice.

This case comes to this court a second time by direct appeal proceedings. When here before two opinions were filed in disposing of it on that occasion, one giving consideration to the points raised upon the record as it then stood (Padlock Ranch, Inc. v. Washakie Needles Irrigation District, 50 Wyo. 253, 60 Pac. (2d) 819) and one directing the denial of a petition for rehearing filed thereafter by the appealing party, the Padlock Ranch, Inc., (Padlock Ranch, Inc. v. Washakie Needles Irrigation District, 50 Wyo. 272, 61 Pac. (2d) 410). On the record now before us the Padlock Ranch, Inc. is again appellant, and may be at times hereinafter

referred to as the "Ranch Company." The respondent, the Washakie Needles Irrigation District, may for brevity also be subsequently mentioned as the "Washakie District."

In these two opinions rendered by the court heretofore, the course of this litigation was rather fully traced, and it will therefore be unnecessary to make any extended restatement concerning the matter at this time. It will suffice to recall that in the first opinion announced as aforesaid, it was pointed out that "one of the necessary elements in a petition for the organization of an irrigation district" pursuant to the statutes of this state, is a "preliminary engineering report on the feasibility of the project" which shall include, as the law (§ 122-701, W. R. S. 1931) proceeds to declare, "a report on the sufficiency of its water supply; the approximate area of irrigable land within the district, including an estimate of the cost of construction; all of which shall be approved by the state engineer." It was indicated in that opinion, also, that as a radical change in conditions had apparently occurred since the date of the engineer's report, December 9, 1933, and the date when the court heard the matter, viz., October 26, 1935, this change then being the creation of a new irrigation district to be known as the "Owl Creek Irrigation District," comprising some three thousand acres of land within the boundaries of the respondent, and such change not being considered and reported upon by the engineer, it could not be ascertained whether in view of the altered circumstances prevailing that the project was feasible. In the course of the opinion considering the situation thus presented, it was said:

"The cost of the project is, of course, one of the important facts to determine whether or not a project is feasible. And it is the duty of the court to determine such feasibility. We cannot find in the statutes that the determination of that fact can be made later in the proceedings of the district, and should, accordingly, be

made at this time. It is true that by subsequent changes made in the boundaries, etc., it is possible that the whole project be ultimately defeated; still we think that the statute contemplates that the feasibility shall fairly and reasonably appear at the time of the organization of the district, before too much additional expense and labor be incurred. Since the engineer's report cannot be relied on, in view of the changed conditions, the point must necessarily be determined by the court by evidence introduced in the case which will be sufficient on that point. * * *

"In other words, it is just, right and proper that each and all of the landowners of the district be reasonably well apprised of the actual cost, and the actual feasibility of the project herein, and that the court determine these points. From what has been said herein, it is clear that the evidence heretofore produced on these points is insufficient. The burden of proof in that regard is on the respondents. The cause is, accordingly, remanded to the district court for the purpose of taking additional testimony on these points and for further proceedings not inconsistent herewith."

In the opinion declining to order a rehearing it was further said relative to this point:

"Unless the court, upon the further hearing of the case, should find that the project is feasible, so far as appellant is concerned, from the standpoint of cost, benefits to appellant, proportionate or absolute, and all other considerations, including the fact of the organization of a 3000-acre district mentioned in the original opinion, the court must necessarily vacate its order heretofore made in so far as the inclusion of the land of appellant in the district is concerned."

The cause accordingly was returned to the district court, and on November 21, 1936, and several days following, the matter was again heard by that court and rather voluminous additional evidence presented therein relating to the issues which by the opinions aforesaid were required to be given consideration. An engineering report supplemental to the "Preliminary Engineering Report" above mentioned, dated October 5, 1936,

approved by the state engineer October 13, 1936, was filed in the office of the clerk of the district court on November 20, 1936, and during the course of the hearing aforesaid submitted to the court for its examination and guidance. Attached to this report were certain exhibits, to-wit: "A", which was a geological report of the state geologist of the State of Wyoming, Dr. S. H. Knight, and his assistant, relative to the dam and reservoir site proposed for the irrigation project; "B", being the report of a consulting engineer from Los Angeles, California, relative to the dam construction proposed; "C", a copy of the preliminary engineering report relative to the Owl Creek Irrigation District hereinabove mentioned; and "D", certain maps of the Washakie District delineating among other things the location of said Owl Creek Irrigation District with reference to the boundaries of the Washakie District.

Under date of December 15, 1936, and entered on December 17th immediately following, the court made an "Order" disposing of the matter. Summarized that order found generally in favor of the Washakie District and against the Ranch Company; that the project was feasible from the standpoint of costs and benefits to that company; that the completion of the project would be beneficial to all irrigable lands within the boundaries of the Washakie District as theretofore established, with the exception of those lands possessing territorial water rights and owned by the Ranch Company, which the court found should be excluded from said district. It was also found that it would be a benefit to the irrigable acreage of the lands included within the Washakie District, both inside and outside of the Owl Creek Irrigation District, and that both of said projects should be constructed. A further finding was made reading verbatim:

"And the court doth further find that approximately twenty one thousand (21,000) acres of irrigable lands

will remain within the boundaries of said Washakie Needles Irrigation District after the elimination of the territorial water right lands of The Padlock Ranch, Inc., a corporation, as hereinafter ordered, and that the total estimated cost of said project is Four Hundred Thousand ($400,000.00) Dollars, of which only Two Hundred Forty Thousand ($240,000.00) Dollars must be borne and paid by the landowners therein, under the proposed Loan and Grant authorization of the Public Works Administration, and that the total cost of said storage available in said reservoir is reliably estimated at not to exceed Twenty ($20.00) Dollars per acre foot of storage capacity, and that the net cost thereof to the landowners will be approximately Twelve and 50/100 ($12.50) Dollars per acre foot of storage capacity in said reservoir, and that the net value of the Grant from the Public Works Administration will be ninety (90¢) to ninety-five (95¢) cents on the dollar of Grant money so obtained."

Judgment was rendered in said "Order" conforming to these findings, modifying the previous order of the district court, creating the Washakie District, and excluding the Ranch Company's lands having territorial water rights. It was also adjudged in substance that the Washakie District project is a "feasible project," and that the cost of the proposed irrigation works therefor would not exceed the benefits that would accrue to the lands remaining within said Washakie District, even though the Owl Creek Irrigation District lands may either partially or wholly be eliminated from the Washakie District, and whether said Owl Creek Irrigation District be constructed or not. It was further adjudged, quoting the order verbatim in this respect, that "the elimination of the lands covered by territorial water rights or which are not proposed to be furnished any supplemental water supply from said project, in no manner affects other lands within said District, for the reason that no portion of the cost of said project should be borne by the said lands so eliminated, and that no assessments for Benefits or Con-

struction could have been approved against said lands and that they would have been eliminated from said District at the time of a hearing on the Report and Petition for the confirmation of Assessments for Benefits and Construction against the lands within said Irrigation District."

It may here be stated that thereafter, apparently by consent of all parties affected, the lands included within the boundaries of the Owl Creek Irrigation District and embraced within the confines of the Washakie District were, by an order dated February 20, 1937, and filed February 25, 1937, excluded from the district last mentioned. No question is presented by this appeal by any one involving this action of the district court.

The Ranch Company appealed from all of the order above summarized except that part of it which found and determined that those lands owned by said company and which had territorial water rights attached thereto, or which were not irrigable under the proposed irrigation project of the Washakie District, should be excluded from said district, on the ground that they would not be benefited. The Washakie District has appealed from that part of the order aforesaid adverse to it and which excluded the Ranch Company's lands just stated as not embraced in the Ranch Company's appeal, and the matter in that behalf has been presented to this court by proceedings which have been assigned No. 2031, "In the Matter of the Organization of the Washakie Needles Irrigation District. Padlock Ranch, Inc., a corporation, Contestant and Respondent, v. Washakie Needles Irrigation District, Contestee and Appellant," duly argued and submitted for decision at the same time with the instant case.

The contentions advanced by the Ranch Company succinctly stated are that the order now questioned by it is not supported by, but is contrary to, the evidence in the case, because its lands retained in the Washakie

District by said order will not be benefited to any extent whatever by the project; that said order finding the irrigation project of the Washakie District feasible is not supported by the evidence, inasmuch as, (a) the evidence fails to show that there will be a sufficient quantity of storable water, and (b) the evidence is substantially undisputed that the loss of water from the reservoir when built and from the Owl Creek Channel will be so great as to render the project not feasible for these reasons.

Concerning the point urged, that the Ranch Company's lands which the court declined to exclude from the Washakie District will not be benefited by the construction of the project proposed, we are satisfied that the evidence is conflicting, but that there was substantial evidence submitted to it authorizing the trial court to find as it did. As regards non-feasibility of the project due to asserted lack of storable water to justify the proposed expenditure, the record is in a somewhat unsatisfactory condition, but perhaps on this point, too, it may with fair accuracy be said that there is some conflict in the evidence contained in the record and some substantial evidence before it which justified the court in finding as was done. Touching the point of non-feasibility of the project because of heavy loss of water from the proposed reservoir and Owl Creek Channel, we are inclined to think that as the matter is at this time presented by the record at bar, there is considerable support for appellant's contention.

No useful purpose would be accomplished by reviewing the evidence on these contentions, although we have necessarily given careful attention to an examination of all of it. It would only tend to produce an unwarranted extension of this opinion. Each case of this character must be to a large extent governed by its own ever varying facts. For this reason and for another which will presently appear, we have contented

ourselves with simply announcing our conclusions as stated above.

Relative to appellant's contention on the point last above mentioned, counsel for the Washakie District urge upon us in their brief,

"If investigation proves that those contentions of sinks or loss of water in the bed of Owl Creek are correct, the District Commissioners should recommend to the court proper plans for stopping these sinks and the loss of water, and the Court, at that hearing, should approve the spending of the necessary money and the plans for the construction of a canal to carry the water out of the stream bed past the sinks, or even to line the bed of the stream to prevent this excess loss of water."

And they further say:

"We contended in the court below and we contend here that at the time of the creation of an Irrigation District is not the proper time nor place to determine what definite plans for furnishing or regulating the water supply to be made available for the lands of the District should be finally determined upon. Instead, it is only in the promotional stage. All proposals must be considered. No definite plan need be agreed upon."

We cannot accede to these views. On the former appeal we said, as has already been pointed out, that "the statute contemplates that the feasibility" of the project "shall fairly and reasonably appear at the time of the organization of the district before too large additional expense and labor be incurred," and it was intimated that the landowners have a right to know the actual cost and actual feasibility of the project as submitted.

Section 122-706, W. R. S. 1931, specifically authorizes any person "owning or entitled to the possession of lands, or any interest or easement in land, within the proposed district, or who would be affected thereby," to "appear and contest * * * the inclusion or ex-

clusion of any lands in the district, or any other material issue raised by the petition." The petition must show by an accompanying engineering report, which the state engineer of this state must approve, as we have seen, the feasibility of the project. (W. R. S., 1931, Sec. 122-701). "Feasible" as defined by the Century Dictionary means "practically possible." Webster's New International Dictionary, Second Edition, defines it as, "capable of being managed, utilized or dealt with successfully." Section 122-706 requires the court to determine this issue before establishing an irrigation district. With these statutory provisions and their sensible interpretation in mind, the above quoted statements from the opinions on the former hearing in this court were promulgated. Certainly the cost of a project is a potent and determining factor in deciding whether it is practicable or capable of being "utilized or dealt with successfully." This view of the matter is already the law of this case.

Our thought is that the property owners in a proposed irrigation district should not be plunged headlong into a project whose plans are not fairly complete and whose feasibility will not be determined until after costly experiments have been imposed upon them. We do not mean to say, of course, that no changes can be made in the proposed plans of a project. Indeed the statutes contemplate that some changes may be had. (Sections 122-714, 122-715, W. R. S. 1931.) But they should be reasonable in view of the original plan, and not formulated with the idea, we think, of adding a heavy item of cost for construction under plans never intended or considered originally when the scope of those plans is viewed as an entirety. Additional construction plans proposing means for obviating serious defects in a reservoir which are likely to produce great leakage, the establishment of a new channel for conducting the water from the intended reservoir, or the

lining of a stream bed for miles with concrete to prevent heavy water losses, are matters which would seem in all fairness to be of such a moment that they should be originally planned for and not tacked on to a project by the commissioners as an afterthought. Full investigation should be made and adequate evidence should be submitted to the court as to the practicability and necessity for such proposals at the time the feasibility of the district is required to be determined.

Other courts in the western section of this nation dealing with the organization of irrigation districts, under laws akin to ours, have expressed somewhat similar views. For example, in the case of In re Harper Irrigation District, 108 Or. 598, 216 Pac. 1020, the court said:

"However, before the county court is authorized to grant a petition for the organization of an irrigation district, satisfactory proofs must be presented, showing a reasonably definite plan of an irrigation works, and one feasible and practical from an engineering view, for the irrigation of the lands within the boundaries of the proposed district, together with the source of an adequate water supply therefor, available to, and obtainable by, the irrigation district when organized. Otherwise, the court will be without the data essential for determining the principal question submitted to its decision, viz.: What lands within the boundaries of the proposed district are 'susceptible of irrigation by the same system of works applicable to other lands in such proposed district'?"

These conclusions would seem to coincide, also, with those expressed by the Montana Supreme Court in Blaser v. Clinton Irrigation District, 100 Mont. 459, 53 Pac. (2d) 1141, concerning the same subject-matter.

When this case and No. 2031 aforesaid were argued, it was represented to the court by counsel for appellant that since the decision of the trial court was rendered the Federal Emergency Administration of Public

Works, through its proper administrative officers, has cancelled its contract with the Washakie District to supply the latter with the loan and grant mentioned in the court's findings, as above stated, for the reason that the project was not feasible, and that the request of the Washakie District for a reconsideration of this decision had been rejected. We understand this situation to be the true one and not denied by the district itself. Authorities were submitted by the Ranch Company to show the propriety of the consideration of these facts by this court at this time. Our examination of the decisions relative to the suggestion leads us to conclude that it is not only proper and fully within the powers of an appellate court of final authority, but absolutely necessary to a proper administration of justice, that we should not disregard such an important change in conditions as have thus appeared in the instant litigation.

More than a quarter of a century ago this court, in Diefenderfer et al. v. State ex rel. First National Bank of Chicago, et al., 14 Wyo. 302, 83 Pac. 591, declared in an opinion by Mr. Chief Justice Potter, that:

"It is, of course, true that the question whether a judgment challenged on error is erroneous or not is to be determined upon the facts disclosed by the record, and as they existed at the time of the rendition of the judgment. But it has frequently been held that in the interest of justice an appellate court may for various purposes take notice of matter occurring since the judgment. A judgment not only valid when rendered, but free from error, considered in relation to the facts as they then existed, may even be vacated, and the cause remanded for proper proceedings, on account solely of something that transpired after it was rendered. (Ransom v. City of Pierre, 101 Fed. 665.)"

In County of Dakota v. Glidden, 113 U. S. 222, 28 L. Ed. 981, 5 Sup. Ct. Rep. 428, the national court of final authority remarked:

"It is said that to recognize this compromise and grant this motion is to assume original instead of appellate jurisdiction.

"But this court is compelled, as all courts are, to receive evidence dehors the record affecting their proceeding in a case before them on error or appeal.

"The death of one of the parties, after a writ of error or appeal, requires a new proceeding to supply his place. The transfer of the interest of one of the parties, by assignment or by a judicial proceeding in another court, as in bankruptcy or otherwise, is brought to the attention of the court by evidence outside of the original record, and acted on. A release of errors may be filed as a bar to the writ. A settlement of the controversy, with an agreement to dismiss the appeal or writ of error, or any stipulation as to proceedings in this court, signed by the parties, will be enforced, as an agreement to submit the case on printed argument alone, within the time allowed by the rule of this court. * * *

"It is by reason of the necessity of the case that the evidence by which such matters are brought to the attention of the court must be that not found in the transcript of the original case, because it occurred since that record was made up.

"To refuse to receive appropriate evidence of such facts for that reason, is to deliver up the court as a blind instrument for the perpetration of fraud and to make its proceedings by such refusal the means of inflicting gross injustice."

See also Gulf, Colorado & Santa Fe Ry. Co. v. Dennis, 224 U. S. 503, 32 Sup. Ct. Rep. 542, 56 L. Ed. 860; Kendall v. Ewert, 259 U. S. 139, 42 Sup. Ct. Rep. 444, 66 L. Ed. 862.

Judge Thayer in Ransom v. City of Pierre, 101 Fed. (8th Cir.) 665, puts the principle in this language:

"As a general proposition, it is doubtless true that an appellate court is required to determine whether a judgment which is challenged by a writ of error is erroneous upon the facts disclosed by the record, and upon the facts as they existed when the judgment was rendered. But, inasmuch as all rules of procedure are

intended to secure the administration of justice in an orderly manner, it does not seem reasonable that a rule of procedure should be observed when it is apparent that a strict adherence thereto will work injustice. When an appellate court has the power to vacate a judgment rendered by a nisi prius court, over whose proceedings it exercises supervision and control, and its attention is called in an authentic manner to something that has transpired since the trial, which renders it inequitable to permit the judgment to be carried into effect, we think that it may lawfully exercise its power to annul the judgment and remit the record to the lower court for such further proceedings as may be necessary."

Where changed conditions affecting the litigation were drawn to the attention of the Federal Circuit Court of Appeals for the Fourth Circuit, in E. I. DuPont DeNemours & Co. v. Richmond Guano Co., 297 Fed. 580, that court, after quoting from Watts v. Unione Austriaca, 248 U. S. 21, 39 Sup. Ct. 1, 63 L. Ed. 100, 3 A. L. R. 323, to the following effect:

" 'This court, in the exercise of its appellate jurisdiction, has power not only to correct error in the judgment entered below, but to make such disposition of the case as justice may at this time require. * * * And in determining what justice now requires the court must consider the changes in fact and in law which have supervened since the decree was entered below,' "

announced its conclusion,

"It follows that, notwithstanding the correct decision of the trial court in the case at bar, it must be remanded for a new trial."

In White v. Old York Road Country Club (Atlantic Refining Company), 518 Pa. 569, 179 Atl. 434, the purport of the decision is given in the syllabus in these words:

"Suit to enjoin erection of filling station was remanded for rehearing, after affirmance of decree grant-

ing injunction, where since decree was rendered there had been encroachment of business within 600-foot radius found to be exclusively residential."

An ample number of additional authorities could readily be supplied, either discussing or applying the principle announced by the foregoing decisions and which we here deem applicable, as already stated.

It appears from the petition signed by the several property owners praying the district court to organize the Washakie District, and which supplies the basis for all subsequent proceedings, that they therein said that they "desire and propose to cooperate with the United States." In the engineering report supplementing the Preliminary Engineering Report accompanying said petition and filed as heretofore stated on November 20, 1936, we find it said:

"Subsequent to the preparation of the Preliminary Engineering Report, above referred to, an application was approved by the Public Works Administration for a loan and grant to this District in the amount of $443,636.00. The amount of the grant was allowed for 45% of the cost of the project.

"This application was filed for an amount of $400,-000.00 which was $40,000.00 in excess of the original preliminary estimate. The Public Works Administration increased the amount over that applied for to the amount given above on the basis that should the cost run in excess of the estimate, this would provide sufficient funds to take care of the same, and thus make additional funds available to the District in case they should be needed. Otherwise the surplus would not be used. From subsequent investigations it is believed that the total funds allowed will be more than ample to complete the proposed construction of the project. * * *

"If it is assumed that the project will cost the total amount of the loan and grant, amounting to $443,-636.00, and that the total cost to the District might amount to $250,000.00, then the cost per acre for the developing of the 22,000 acre feet of storage, which is

the capacity of the proposed Anchor Reservoir, would be $11.36, which is an exceedingly low cost per acre foot of storage capacity."

This report carries the written approval of the state engineer of the State of Wyoming.

A certified copy of the proposal of the Federal Emergency Administration of Public Works, as mentioned above, was also offered and received in evidence on the hearing before the district court. We have already noted that the district court based controlling findings thereon in the order now under review. It is perfectly apparent that the petitioners, all the parties affected, and the district court proceeded in the case from its inception to and including the entry of the order establishing the Washakie District now under review, relying on the important fact that the proposed loan and grant to said district would be forthcoming.

The comparatively recent case of Board of Education of City of El Dorado v. Powers, State Auditor, 142 Kans. 664, 51 Pac. (2d) 421, is instructive in this connection. There a writ of mandamus was sought to compel the state auditor to register the bonds of a school board, the issuance whereof had been voted upon by the qualified electors of the city of El Dorado. The auditor had declined to register the bonds on the ground that the special question of proposition submitted to the electors did not clearly state the proposed project for which the bonds were to be issued, and hence the board was without power or authority to issue the bonds. Declining to allow the writ and holding the auditor's position correct, the court said in the course of its opinion:

"The resolution asking the mayor to call the election clearly shows a proposed expenditure of a sum almost twice as great as the amount of bonds to be voted, and it shows in detail how it is proposed to get the entire sum to be expended; it excludes any intention of erect-

ing a school building for the amount of the proceeds of the bonds, and it is a fair inference from the resolution that no school building would be built if for any reason federal moneys were not obtained. The proposition, as submitted, showed only the board desired authority to issue $198,500 of bonds for the purpose of erecting a school building. The voter who saw the election proclamation, read it, and noted the date, and thereafter went to the polls and voted, had no means of knowing that it was proposed to erect a building which when erected and equipped would cost over $390,000. The voter reading the proclamation might have been willing the board spend $198,500 and he might have voted therefor, or he might have been indifferent and not have objected to an expenditure of that amount and not have taken the trouble to vote. Had he known that almost double that amount was to be expended, he might have reasoned that a $390,000 expenditure meant increased costs for maintenance, supervision, and upkeep, a larger school, and a more expensive establishment than he thought necessary or advisable, and have voted against such an issuance. Plaintiff argues that the excess cost is to be paid through a federal agency and that it will not cost the taxpayer nor increase his burdens, but that is not entirely true, or if it were, he was entitled to know it when he was legally advised there was to be an election."

See also City of Iola v. Hobart, Mayor, 141 Kan. 709, 42 Pac. (2d) 977.

In this connection it is proper to recall that one of the principal reasons for remanding the instant case for a second hearing was because of changed conditions arising after the engineering report accompanying the petition had been made up, viz., the superimposing of the Owl Creek Irrigation District upon lands included within the Washakie District, without any opportunity on the part of the parties affected or the district court to give the consequences thereof proper consideration, so as not to impose an unwarranted burden upon the property owners affected.

Accordingly, as the matter stands now, it is undoubt-

edly only fair and just that the petitioners, all parties concerned and the district court should be fully advised of this changed condition of affairs which bears so directly and so vitally upon the feasibility of this irrigation project so far as the matter of its cost to those who will have to bear it is involved. If the district should be formed hereafter, we think it should be apparent and established before the court that everyone affected thereby shall have given their consent to the creation of the corporation with positive knowledge that no aid will be received from the proposed governmental source, as that matter was heretofore submitted to the court, so that the district court may determine the feasibility of the project under the then existing circumstances. If this is not done, the landowners within the proposed district may have put upon them expenses, costs and an organization which they never for one moment would have agreed to or should be required to bear.

We accordingly must reverse the order of the district court of Hot Springs County and remand the case for proceedings not inconsistent with the views herein expressed.

*Reversed and remanded.*

BLUME, C. J., and KIMBALL, J., concur.